# IN THE COURT OF APPEALS OF TENNESSEE AT JACKSON
April 9, 2024 Session

## NIEL PROSSER ET AL. v. MEMPHIS AND SHELBY COUNTY BOARD OF ADJUSTMENT ET AL.

### Appeal from the Chancery Court for Shelby County
No. CH-22-1184    JoeDae L. Jenkins, Chancellor
_____

### No. W2023-01057-COA-R3-CV
_____

This case involves questions of zoning of non-residential real property located in a residential zoning district in Memphis. The genesis of the present dispute is specifically traceable to the Memphis and Shelby County Division of Planning and Development's issuance of a zoning letter, wherein it was stated that use of the property at issue in this matter as a "Philanthropic Institution with Offices and Clinic" is a use permitted in accordance with a prior 2017 variance from zoning. The appellants herein, who own a home near the subject property, took umbrage with the zoning letter and appealed to the Memphis and Shelby County Board of Adjustment. When the Board of Adjustment rejected the appeal, thereby upholding the zoning letter, the appellants filed a petition for a writ of certiorari in Chancery Court. The Chancery Court ultimately upheld the action of the Board of Adjustment, following which the present appeal ensued. For the reasons stated herein, we reverse the Chancery Court's decision to affirm the decision of the Board of Adjustment and remand for the entry of an order reversing the decision of the Board of Adjustment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

J. Lewis Wardlaw, Memphis, Tennessee, for the appellants, Sarah Savage Prosser and Niel L. Prosser.

Robert B. Rolwing and Sean Michael Olsen, Memphis, Tennessee, for the appellees, Memphis and Shelby County Division of Planning and Development, Memphis and Shelby County Board of Adjustment, and Shelby County, Tennessee.

Jonathan C. Hancock and Locke Houston Waldrop, Memphis, Tennessee, for the appellee, Friends for All Corporation.

John B. Turner, Jr., Memphis, Tennessee, for the appellee, City of Memphis.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

The appellants in this case, Niel and Sarah Prosser ("the Prossers"), own a home at 206 Stonewall Street in Memphis. The property at issue herein, which has municipal addresses at 1532 and 1548 Poplar Avenue, is located nearby to the Prossers' Stonewall Street home and is owned by Friends for All ("Friends"),[1] a nonprofit organization whose mission is "to prevent the spread of HIV and help those who live with HIV live well." For ease of reference, we will refer to the subject property at issue in this case as "the Friends Property" throughout this Opinion.

*A 2022 Zoning Letter Frames the Nature of the Present Dispute*

Friends acquired the Friends Property in 2021, and subsequently, on May 9, 2022, the Memphis and Shelby County Division of Planning and Development ("DPD"), issued a zoning letter to Chooch Pickard, an architect for Friends. In relevant part, this zoning letter ("the 2022 Zoning Letter"), which was authored by Municipal Planner Lucas Skinner, broached the effect that a use variance from 2017 had on the Friends Property. The 2022 Zoning Letter specifically outlined as follows on the subject:

> This letter is in response to your request for zoning information regarding the above referenced property. To wit:
>
> - The current zoning classification for the subject property is:
>
>   Residential Urban – 3 (RU-3) District within the Evergreen Historic District (H).
>
> - Is the subject property located within an Overlay District?
>
>   Yes, the subject property is located within the Midtown District (MD) Overlay.
>
> - Information regarding variances, special permits/exceptions, ordinances or conditions.
>
>   The following apply to the subject property:
>
>   A use variance (BOA 2017-059) approved by the Memphis and Shelby County Board of Adjustment on August 23, 2017. The case approved offices in relation to a philanthropic organization as well as the potential for a medical clinic. See enclosed Notice of Disposition/Final Site Plan.
>
> - The current / proposed use of the subject property as a "Philanthropic Institution with Offices and Clinic" is a:
>
>   Use permitted in accordance with the above approved variance (BOA 2017-059). Please see attached final site plan for conditions from the case.

---

[1] Friends was formerly known as Friends for Life.

It is the Prossers' position that the 2022 Zoning Letter countenanced uses for the Friends Property that had not, in fact, been previously approved, and following the issuance of the 2022 Zoning Letter, they appealed to the Memphis and Shelby County Board of Adjustment ("the Board"). As discussed in more detail below, the Board rejected the merits of the Prossers' appeal, and although the Prossers then sought relief in the Shelby County Chancery Court ("the trial court") by way of a petition for a writ of certiorari, the trial court in turn affirmed the decision of the Board. Through the present appeal, the Prossers challenge the trial court's decision to affirm the Board's upholding of the 2022 Zoning Letter.

*Variance History Concerning the Friends Property*

Of note, although the 2022 Zoning Letter itself singularly represented that a use variance from 2017 applied to the Friends Property—and concluded that use of the Friends Property as a "Philanthropic Institution with Offices and Clinic" was a use permitted in accordance with that 2017 variance—the 2017 variance was not the only variance actually applicable to the Friends Property. Indeed, as acknowledged by the parties in connection with this litigation, other variances concerning the Friends Property were granted prior to 2017. Inasmuch as these prior variances were the subject of much discussion in the Prossers' appeal before the Board and, later, in the trial court, we outline that history here at the outset.

Pursuant to a copy of a PowerPoint slide contained in the administrative record, which the record on appeal indicates was shown to the Board in connection with the Prossers' appeal of the 2022 Zoning Letter, the pre-2017 zoning history for the Friends Property was summarized as follows:

- **1951**: Baptist Brotherhood Commission files a variance (BOA 1951-116) to "permit conversion of existing building for headquarters". The variance is approved.
- **1962**: Baptist Brotherhood Commission files a variance (BOA 1962-45) to add a new entranceway to the front of the building. The variance was approved. A time extension was subsequently filed and approved for 6 months to allow a building permit to be filed.
- **1969**: Baptist Brotherhood Commission files a variance (BOA 1969-03) to "permit the erection of an addition to an existing institutional building; with a reduction in the required front yard facing North Willett Street". The variance was approved. This variance approved the eastern addition to the building.

As for the aforementioned 2017 variance, the application for said variance had initially sought a variance "to allow office and/or indoor multi-story self service storage." In relevant part, the application for the variance detailed that the "property consists of a 3-story office building in the RU-3 zoning district" and that "[c]ommercial uses such as office and indoor self-storage are not permitted." The request for storage use was later discarded. In detailing this, as well as the nature of the prior variances that preceded the application for the 2017 variance, a DPD[2] staff report from 2017 ("2017 Staff Report") contained the

---

[2] As a technical matter, this staff report bears a heading signifying that it was prepared by "OPD,"

following relevant statements and conclusions:

> *The subject property has been in use as an office or headquarter[s] since the approval of a variance dating to 1951.* A *continuation of that use* with limitations seems prudent and reasonable.

> . . . .

> Staff discussed the requested uses with the applicant's representative and both agreed that the indoor self-storage was too intense a use for this property. Thus, the applicant [sic] has been revised to only request an office use for this property.

> The applicant's justification is based on the long-term use for this property as office and that this is a large building that can serve multiple uses.

> **Background**

> A variance from the zoning regulations was approved on 1548 Poplar Avenue to allow the conversion of an existing building for headquarters home for the Baptist Brotherhood Commission (see Docket Number 51-116, circa December 1951).

> A subsequent variance was filed under Docket # 62-45 City; however that file was not available for review. A third variance, Docket # 69-3, was approved in January 31, 1969. This application involved the property located at the northwest corner of Poplar and Willett. The approval of this variance allowed the "erection of an addition to an existing institutional building; with a reduction in the required front yard facing North Willett street."

> . . . .

> **Review of Request**

> As indicated above, an adaptive re-use of property on the north side of Poplar Avenue . . . . *The language of the approvals lead one to the conclusion that the intended use of the property was for an institutional office use.* One of the most recent users of this site was in fact a not-for-profit use, Livable Memphis.

---

the Office of Planning & Development. According to a glossary appearing in connection with the Prossers' appeal before the Board, OPD, now called Land Use & Development Services, is a department of the DPD.

The use of the property for smaller office users has proven itself to be a viable option for the property. There is no reason that similar uses cannot and should not be able to continue to operate at this site. But as the building itself is listed by the Assessor's Office as containing over 3,800 square feet of space, *it is not unreasonable to request that a larger pool of office users be allowed to occupy some or all the building.*

. . . .

Since the *request* if [sic] *for office uses*, staff has consulted that section of the UDC that lists typical office uses permitted by right in the office category. From that list, staff has added a list of uses that are not permitted on this site in the conditions.

(emphasis in italics added)

At another page in the administrative record, which appears to signal the attachment of the above 2017 Staff Report, the following notation is present:

**Board of Adjustment Staff Reports - BOA 17-59 City - 1548 Poplar**

**Brief Description -**
Use Variance to permit uses to include office uses other than institutional or not for profit offices.

This archive is a document file. Click on the link below to open it, or right-click to save the document or open it in a new window.

Final Staff Report-Bapt Brotherhood- BOA 17-59 City.pdf (2253 kb)

As is evident from this, as well as the statements emphasized above that were included in the 2017 Staff Report, and as is entirely consistent with the 1951 variance's allowance of "headquarters" for the Baptist Brotherhood Commission, it was understood contemporaneous to the application for the 2017 variance that "institutional"/"not for profit" offices were previously allowed, and the 2017 variance application was perceived as one to be seeking additional, "commercial" office uses. The application for the 2017 variance itself proposed that commercial uses "are logical re-uses of the existing building" and stated that "[t]he property consists of an existing office building and the use variance is needed in order to continue a similar use." It is within this context that we specifically take note of another line appearing in the 2017 Staff Report, a line which discusses the proposed 2017 variance as a "Use Variance to permit office uses in addition to the institutional (i.e., not for profit and/or philanthropic uses) that have been permitted under prior Board of Adjustment Actions . . . ."

- 5 -

According to the minutes from the Board concerning an August 23, 2017, meeting relative to the 2017 variance application, the applicant was then requesting a variance "to allow office uses." Although the Board acted to approve this request, it did so with conditions. The text of the resolution from the Board's action in 2017 provided that "a building permit and/or Certificate of Occupancy permit in conformity herewith shall be obtained from the Memphis and Shelby County Office of Construction Code Enforcement within two (2) years from the date of granting said use variance." Moreover, the Board specified that a number of specific uses, such as "[p]hotocopying, package shipping, blueprint" and "[u]rgent care or emergency medical office" were prohibited, while further providing in part that "[a] medical office or physical therapy office may be permitted, if said use provides a detailed parking study to substantiate that the actual parking needed for said use can be accommodated on site."

*Points of Contention and Highlighting Some of the Proof and Arguments Presented to the Board*

Of much dispute is that, subsequent to the Board's August 23, 2017, meeting, in a filed "site plan" from December 2017, the 2017 variance was referred to in accordance with certain of the same language appearing in the 2017 Staff Report that was referenced earlier, i.e., as a "Use Variance to permit office uses in addition to the institutional (i.e., not for profit and/or philanthropic uses) that have been permitted under prior Board of Adjustment Actions . . . ." Indeed, the sticking point among the parties in this case appears to in large part surround whether "philanthropic use," outside of office use, was ever countenanced by the Board by way of a variance.[3]

In the wake of the issuance of the 2022 Zoning Letter, which, as noted earlier, stated that use of the Friends Property as a "Philanthropic Institution with Offices and Clinic" was permitted in accordance with the 2017 variance, Mr. Pickard, Friends' architect, sent an email expressing the following opinion:

> We feel that this [2022 Zoning Letter] should make it very clear that the uses and services that will be provided by Friends . . . are consistent with the uses outlined in the BOA Variance and the Unified Development Code under Philanthropic and Medical Clinic uses. This property has been a legally non-conforming (in laymen's terms, "grandfathered in") philanthropic headquarters serving the community in different capacities for almost 100 years. From our understanding, in 2017 the owner of the property applied for and was granted a variance that would codify the legally non-conforming uses of philanthropy and medical as conforming uses so that it would no

---

[3] Of course, as noted earlier and as discussed again later in this Opinion, the 2022 Zoning Letter itself singularly represented that a use variance from 2017 applied to the Friends Property and made its determination concerning permitted use as something that was in accordance with that *2017* variance.

longer be "grandfathered in".

The record indicates that this email was forwarded to the Prossers. The Prossers disagreed the 2017 variance had permitted "philanthropic use,"[4] but they also submitted that the 2017 variance had itself lapsed. Their argument that the 2017 variance had lapsed was based on the language in the 2017 variance that had provided that "a building permit and/or Certificate of Occupancy permit in conformity herewith shall be obtained from the Memphis and Shelby County Office of Construction Code Enforcement within two (2) years from the date of granting said use variance." There does not appear to be any dispute that no such permit or certificate was ever obtained. According to the author of the 2022 Zoning Letter, however, the 2017 variance had not lapsed in light of same. Expressing his opinion on this matter before the Board, Mr. Skinner stated as follows: "[N]o one needed to file for a building permit because it was already an office building. And there was no certificate of occupancy needed because there was no real change in the sort of description of use or the grouping of uses. It was still some sort of an office use."

When Mr. Prosser spoke at the hearing before the Board, he noted that he had no issue with Friends coming and using the building; he simply wanted the Friends Property to be used as it always had. In explaining his position on this issue, Mr. Prosser stated as follows:

We just don't want it to be used for things . . . other than what it's always been allowed for within what is otherwise a residential zoning.

The position that staff has taken here is radical. They have taken the position that because [Friends] is a non-profit, a philanthropic institution, that it essentially can do anything it wants to on the property. Y'all have never been presented with any of the uses, beyond office, that [Friends] wants to partake of here.

Continuing on, Mr. Prosser stated:

[I]t is ironic because back in 2017 . . . the two parts of that request were office use and mini self-storage to use the building for indoor self-storage. The staff and [the individual presenting the application] agreed that . . . mini self-storage was too intense of a use, too intense of a use for that property.

How intense is what [Friends] is proposing now?

Mr. Prosser then went on to reference a document entitled "Friends for Life Daily

---

[4] The Prossers further maintained that the 2017 variance did not allow the uses intended by Friends as either principal or accessory uses.

Activities," which he noted had been presented to the neighborhood.  This document, which was in the record before the Board, outlines, among other items, the following as daily activities for Friends:

- A food pantry serving twenty to thirty clients a day
- A "Positive Living Center" serving thirty clients throughout the day
- A "Wellness University" serving ten to twenty clients per day
- "Medical Case Management" for ten to fifteen clients per day
- Mental health services for approximately eight to ten clients per day

Friends did not believe it was limited to office use on the Friends Property, and its Executive Director, Diane Duke, testified before the Board that she had been "really excited" to find the property at issue and that she had "checked on the zoning for the building, and . . . found out that, yes, this -- this building is a place that we could be."  Ms. Duke's testimony further indicated that Friends had created a "Myths vs Facts" information sheet concerning the use of, and restrictions pertaining to, the Friends Property.  In relevant part, this document read as follows concerning the alleged "myth" that the variance for the use of the Friends property was limited to office use:

Myth:    *The variance for Poplar Avenue is for office use.*
Fact:    The parcels owned by Friends For Life, 1548 Poplar Avenue (Parcel 020045 00022C) and 1532 Poplar Avenue (Parcel 020045 00027) are zoned Residential Urban – 3 (RU-3) and are located within the Evergreen Historic District (H) and Midtown District (MD) Overlay. On August 23, 2017 a use variance (BOA 2017-059) was approved by the Memphis and Shelby County Board of Adjustment. The case approved offices in relation to a philanthropic organization as well as the potential for a medical clinic. Friends For Life's current / proposed use of the subject property as a "Philanthropic Institution with Offices and Clinic" is a use permitted in accordance with the approved variance (BOA 2017-059). For further information visit the Unified Development Code. https://www.develop901.com/landusedevelopmentservices/zoningSubdivisionAdministration

As for the testimony of Mr. Skinner, despite having authored the 2022 Zoning Letter, which, as noted earlier, opined that use of the Friends Property as a "Philanthropic Institution with Offices and Clinic" was a use permitted in accordance with the 2017 variance, Mr. Skinner testified before the Board that the 2017 variance itself "was for office."  According to him, "previous cases [are] where the philanthropic came about."  Reiterating this matter again, he explained as follows: "So the 2017 [variance] was essentially the culmination of adding office uses on top of the **already previously approved** philanthropic uses."[5] (emphasis added)  Of note, though, when Mr. Skinner specifically engaged with the variances that predated the 2017 variance, he simply noted that, with respect to the 1951 variance, a variance had been approved to, in his words, "permit diversion of . . . building for headquarters [of the Baptist Brotherhood Commission]."  Continuing on, Mr. Skinner then outlined the subsequent variance history

---

[5] Earlier in his testimony, when addressing the contention that the 2017 variance did not permit philanthropic use, Mr. Skinner had stated as follows: "I mean, we felt, given the literally first statement on the conditions that it did allow an institutional, i.e., not-for-profit and/or philanthropic uses."

as follows:

> Several years later in 1962, the Baptist Brotherhood Commission filed a variance to add . . . a new entranceway to the building, and there was a time extension filed and thusly approved to allow them to file a building permit for that entranceway.
>
> 1969, pretty similar request to basically add the addition onto the east side of the building with a reduction in the required front yard setback facing North Willett. That was approved.
>
> And then in 2017, finally, a separate applicant filed a use variance to allow office uses and indoor ministorage at the site, which was owned by the Memphis Leadership Foundation at the time. Staff and the Applicant struck the indoor mini storage portion of the request, and they kept the remaining portion of the request for office uses, and that variance was approved.

Mr. Skinner acknowledged that the zoning for the Friends Property was "Residential Urban 3" and that the Friends Property was in an "obviously very residential portion of this neighborhood."

Other information and voices before the Board had broadly suggested that the 2017 variance was more than just for office uses. In addition to the "Myths vs Facts" information sheet detailed earlier, which had presented it to be a "myth" that the variance was for office use, Mr. Pickard generally stated that the 2017 variance, as well as the 1951 and 1969 variances, "allow for philanthropic uses, which Friends . . . provides."

Addressing the notion that variances prior to 2017 had supposedly approved "philanthropic uses,"[6] counsel for the Prossers argued before the Board that the 1951 variance had simply allowed a headquarters home of the Baptist Brotherhood Commission, thereafter representing that the dictionary definition of a headquarters is "the administrative center of an enterprise."[7] Of note, when speaking on the Baptist Brotherhood Commission and its use of the Friends Property, Mr. Skinner remarked, "[E]ssentially, the building was used as a headquarters . . . ."

---

[6] This appears to be the primary understanding or conclusion reached by Mr. Skinner, at least as specifically conveyed through his testimony before the Board. Again, Mr. Skinner ultimately noted that "previous cases [are] where the philanthropic came about" and stated that the 2017 variance "was essentially the culmination of adding office uses on top of the already previously approved philanthropic uses."

[7] Counsel further noted that the variances from the 1960s did not add any use rights and were "irrelevant," a point which the Board stated was correct in its briefing before the trial court.

*Discussion and Board Vote*

During discussion among the Board, one Board member noted that the Baptist Brotherhood Commission had been headquartered at the Friends Property, "only administered." He noted that "[i]t was just their offices and headquarters from which they operated out of . . . ." Then, at the end of the hearing, but before the Board's vote, the Board's Chairman framed the vote in the following terms: "[W]hat we're really voting on, to be clear, is whether or not the zoning letter using the term philanthropic was accurate. That's what we're really voting on." Later, he added, "Yes vote would be in favor of the appeal that the zoning letter was not accurate." The Board thereafter voted to deny the Prossers' appeal.

*Proceedings in the Trial Court and Resulting Judgment*

In the ensuing proceedings in the trial court,[8] the Board responded to the Prossers' petition for a writ of certiorari by admitting in its answer that the 2017 variance "did not expressly include the [philanthropic, non-office] uses" that had been publicly announced by Friends. According to the Board, however, "two previous variances permitted or approved them." In a later-filed memorandum in the trial court, the Board specifically related in a parenthetical that the 2017 variance concerned "commercial 'Office Use.'"

The trial court, too, understood that the 2017 variance had been to accommodate "commercial" office use, stating as follows with respect to that variance and the 1951 variance that preceded it: "It appears to the court that when the 2017 variance was sought, institutional office use had already been granted by the 1951 variance for a headquarters, and that the 2017 variance permitted the additional use of commercial offices." In the end, though, the trial court affirmed the decision of the Board, opining that the 2022 Zoning Letter "did not unlawfully expand the 2017 or 1951 variance."

**DISCUSSION**

As signaled earlier, this dispute is framed by the DPD's issuance of the 2022 Zoning Letter and the Board's subsequent decision upholding the 2022 Zoning Letter. Although the Prossers raise several issues in connection with the appeal, we are of the opinion that they all centrally speak to, or revolve around, the following dispositive question before us: whether the Board erred in its decision to uphold the 2022 Zoning Letter.

As directed by the Memphis and Shelby County Unified Development Code ("UDC"), the Prossers challenged the Board's action by filing a petition for a writ of certiorari in the trial court. *See* UDC § 9.23.4 ("Appeals from any decision of the Board

---

[8] We observe that the following parties were named as Respondents in the Prossers' petition for a writ of certiorari: the Board, the DPD, the City of Memphis, Shelby County, and Friends.

of Adjustment may be taken in accordance with Chapter 9, Title 27 of the Tennessee Code Annotated."); Tenn. Code Ann. § 27-9-101 ("Anyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state may have the order or judgment reviewed by the courts, where not otherwise specifically provided, in the manner provided by this chapter."); Tenn. Code Ann. § 27-9-102 ("Such party shall, within sixty (60) days from the entry of the order or judgment, file a petition of certiorari in the chancery court . . . ."). The parties all correctly acknowledge through their briefing that the standard of review applicable to the trial court in common law of writ of certiorari proceedings applies to this Court as well. *See Abbington Ctr., LLC v. Town of Collierville*, 393 S.W.3d 170, 176 (Tenn. Ct. App. 2012) (noting that the standard applies to both the trial court and this Court). As for the nature of that review, the scope of review is limited to whether the Board has exceeded its jurisdiction or has acted illegally, arbitrarily, or fraudulently. *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990); *see also Abbington Ctr., LLC*, 393 S.W.3d at 175 (noting that, under the standard of review, courts review to determine whether the lower tribunal exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support the decision).

As this Court has further noted:

[U]nder the common law writ, courts may examine a lower tribunal's decision in order to determine if it is arbitrary or capricious. Since judicial review under the Administrative Procedures Act also includes review to determine if an agency's decision is arbitrary or capricious, authorities describing that standard are helpful in defining those terms. In *Jackson Mobilphone Co. v. Tennessee Public Serv. Comm'n.,* 876 S.W.2d 106 (Tenn. App. 1993), this court discussed the standard for determining whether a decision is arbitrary, stating that an agency decision not supported by substantial and material evidence in the record is arbitrary and capricious and, even where adequate evidence is found in the record, an agency's decision may still be arbitrary and capricious if caused by a clear error in judgment.

*Brunetti v. Bd. of Zoning Appeals of Williamson Cnty.*, No. 01A01-9803-CV-00120, 1999 WL 802725, at *4 (Tenn. Ct. App. Oct. 7, 1999). Further, an arbitrary decision is one that "disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* at *5 (quoting *Jackson Mobilphone Co.*, 876 S.W.2d at 111).

At the outset of our review, we find it prudent to emphasize the nature of the 2017 variance. We do so because, as we have noted earlier in this Opinion, the 2022 Zoning Letter speaks in terms of what use was permitted on the Friends Property in accordance with the approved 2017 variance; moreover, it is the Board's decision to uphold the 2022

- 11 -

Zoning Letter that is at issue in this case. With that in mind, we stress that the record plainly shows that the 2017 variance did not approve "philanthropic use" in any specific, or even general, respect. Indeed, notwithstanding the viewpoint reflected in the email that Mr. Pickard authored in the wake of the issuance of the 2022 Zoning Letter, wherein Mr. Pickard expressed that it was his understanding that the owner of the Friends Property had applied for, and was granted, a variance in 2017 that codified "uses of philanthropy,"[9] the actual application for a variance, and what was approved in 2017, had nothing to do with philanthropic use. This was made clear even by Mr. Skinner, who, despite authoring the 2022 Zoning Letter which stated that use of the Friends Property as a "Philanthropic Institution with Offices and Clinic" was permitted in accordance with the 2017 variance, testified before the Board that the 2017 variance "was for office." As noted earlier, he claimed that "the philanthropic" supposedly "came about" from "previous cases."

As should be clear from our earlier exposition, this assessment that the 2017 variance "was for office"—and did not concern an application for philanthropic use—is something that is clearly supported through the proof in the administrative record. Indeed, it is manifest upon even a cursory review of the application for the 2017 variance and the Board's resolution regarding same in 2017. To briefly recap, the application for the 2017 variance had initially sought a "[v]ariance . . . to allow office and/or indoor multi-story self service storage." In relevant part, the application for the variance further specifically detailed that the "property consists of a 3-story office building in the RU-3 zoning district" and that "[c]ommercial uses such as office and indoor self-storage are not permitted." Whereas the request for storage use was discarded, the request for office use was not, and in the minutes from the Board's meeting relative to the 2017 variance application, it was specifically noted that the applicant was then requesting a variance "to allow office uses." The Board in turn approved the request for a variance subject to the conditions previously detailed herein. Office use, not "philanthropic uses," was approved, and to this end, the suggestions made by certain individuals to the contrary are simply inaccurate. By way of example, one such suggestion is the opinion by Mr. Pickard in his email that the owner of the Friends Property had applied for, and was granted, a variance in 2017 that codified "uses of philanthropy." That opinion and understanding is, again, simply not accurate.

Much has been made, however, of the December 2017 site plan mentioned earlier in this Opinion, namely that said site plan, contemporaneous to its referencing of the 2017 variance, employed some of the same language appearing in the 2017 Staff Report, including the following phrase: "not for profit and/or philanthropic uses." In its brief,[10] for

---

[9] Similar to Mr. Pickard's expression of his opinion through his email that "uses of philanthropy" were countenanced in the 2017 variance, Friends circulated the aforementioned "Myths vs Facts" information sheet wherein it represented as "myth" that the variance was for office use. In its context, we read Friends' information sheet as attempting to posit that the variance was, supposedly, not "just" for office use.

[10] As a technical matter, we observe that the brief was submitted collectively on behalf of the Board, the DPD, the City of Memphis, Shelby County, and Friends.

instance, the Board references this fact in an attempt to rebut the Prossers' challenge to the 2022 Zoning Letter, arguing in relevant part as follows:

> The Zoning Letter at issue states that, "The current/proposed use of the subject property as a 'Philanthropic Institution with Offices and Clinic' is a: Use permitted in accordance with [the 2017 variance]." Appellants challenge that finding on the ground that the Board Resolution that granted the 2017 variance does not itself use the word "philanthropic," and that "philanthropic use" is not a recognized use in the UDC. On the contrary, "philanthropic use" appeared first in the 2017 Staff Report to the Board analyzing the application for an Office use, and again on the applicant's final site plan . . . .

(internal record citations omitted)

Although somewhat confusing in light of other acknowledgments appearing in the record concerning the actual scope of the 2017 variance, which is a matter that we will return to shortly, the suggestion by the Board in the above excerpt appears to be that, because "philanthropic use" language appeared on a site plan after the Board granted the 2017 variance, the Board was thereby approving a "philanthropic institution"[11] or "philanthropic use." Mr. Skinner himself, despite later clarifying before the Board that the 2017 variance "was for office," had relayed in his testimony that "it was initially and definitively the specificity of the language of the 2017 case that led me to the decision [in the 2022 Zoning Letter that philanthropic use is permitted on the Friends Property]." Counsel for the Board would later reference this line of thought when arguing before the trial court:

> Regarding the 2017 variance, Mr. Skinner testified that it was initially and definitively the specificity of the language of the 2017 case that I've just read that led me to the decision that philanthropic use is a permitted use on the property.
>
> So that's how we got to the philanthropic use.

In addressing this argument, we observe that to the extent that the "philanthropic" language came up in 2017—and there is no dispute that such language made an appearance in connection with the variance process in 2017—such phraseology, even within the December 2017 site plan, was utilized as a means to refer to what had purportedly been approved in *prior* Board actions. Indeed, as just covered above, although Mr. Skinner had

---

[11] Under the UDC, the term "Philanthropic institution" appears as a principal use within the community service civic use category. UDC § 2.9.3.

- 13 -

stated before the Board at one point that "it was initially and definitively the specificity of the language of the 2017 case that led me to the decision [in the 2022 Zoning Letter]," his testimony was otherwise clear, and accurate, that the 2017 variance "was for office," as he noted that the 2017 variance was an addition "on top of the already *previously approved* philanthropic uses." (emphasis added) To the extent therefore that the Board may be suggesting in this appeal that the 2017 variance approved "philanthropic use" or, to use the specific language of the UDC, a "Philanthropic institution," it is simply mistaken. Such a viewpoint does not reflect the reality of what the 2017 variance approved, and as already covered, the Board actually accurately acknowledged in its answer in the trial court that the 2017 variance did not expressly include philanthropic uses, including the non-office uses publicly announced by Friends. The Board maintained, though, similar to what Mr. Skinner had represented in his testimony before it, that "previous variances" permitted such uses.

With all of the foregoing in mind, it should be clear that the 2022 Zoning Letter is, on its face, simply inaccurate. Indeed, although the 2022 Zoning Letter indicates that use of the Friends Property as a "Philanthropic Institution" is a use permitted in accordance with the 2017 variance and that the 2017 variance "approved offices in relation to a philanthropic organization," the approval in the 2017 variance did not itself have anything to do with questions of "philanthropic use" or a "Philanthropic Institution." Consequently, even assuming arguendo that the Prossers are incorrect in their position that the 2017 variance expired due to the absence of anyone obtaining a building permit or certificate of occupancy within two years of the variance being granted, we are of the opinion that it was a clear error in judgment for the Board to uphold the 2022 Zoning Letter, as that letter plainly misrepresents the scope of what was approved in the 2017 variance and otherwise disregards the actual facts and circumstances attendant to that variance. As such, we conclude that the Board's action was arbitrary and capricious and therefore reverse the decision of the trial court. *See Brunetti*, 1999 WL 802725, at \*4-5 (noting that a decision may be arbitrary and capricious if caused by a clear error in judgment and stating that an arbitrary decision is one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion). The 2017 variance simply had nothing to do with approving or permitting a "Philanthropic Institution" or "philanthropic use."

In reaching our disposition in this Opinion, we stress that the only action technically before us in the present appeal is the Board's decision to uphold the 2022 Zoning Letter. That is the only issue, and the Board's Chairman openly acknowledged during the course of the Board hearing what was then before the Board: "[We are not here to determine] what they may do and who may be in the park and any of that. *It's just the zoning letter was that correct or not*." (emphasis added) As previously outlined, the Board's Chairman later instructed in connection with the voting that a "Yes" vote "would be in favor of the appeal that the zoning letter was not accurate." Whereas in our foregoing discussion we outline our opinion as to why the Board's ensuing action as to that question was arbitrary and

- 14 -

capricious, the discourse that has emerged in this case has reflected a focus beyond simply whether what was stated in the 2022 Zoning Letter, and its specific reliance on the 2017 variance, was accurate. Indeed, the larger discourse has at places expanded to whether any type of non-office or non-administrative use has *ever* been countenanced by the Board with respect to the Friends Property, whether in 2017, 1951, or otherwise. For instance, to return again to the answer that the Board filed in the trial court, although the Board admitted that the 2017 variance did not expressly include philanthropic uses, including the non-office uses publicly announced by Friends, it submitted that "previous variances" permitted such uses. In the same general vein, we note that, notwithstanding Mr. Skinner's testimony that "it was initially and definitively the specificity of the language of the 2017 [variance] case that led me to the decision [in the 2022 Zoning Letter]," and further, although the 2022 Zoning Letter itself in turn spoke in reference to that 2017 variance, Mr. Skinner also testified that he had looked at "previous cases." Mr. Skinner then later remarked, as we previously detailed, that "the 2017 [variance] was essentially the culmination of adding office uses on top of the **already previously approved** philanthropic uses." (emphasis added) In other words, supposedly, "philanthropic uses" had *previously* been approved before the 2017 variance.

As to that question, what the record actually points to is the prior approval of a "headquarters" for a nonprofit. As described in the 2017 Staff Report: "[t]he language of the approvals lead one to the conclusion that the intended use of the property was for an institutional office use."[12] Of course, although the applicant for the 2017 variance sought to expand the available uses beyond the prior approvals so as to embrace commercial uses, its application noted that "[c]ommercial uses such as office" would be "logical re-uses of the existing building." In fact, the application further noted that "[t]he property consists of an *existing office building* and the use variance is needed in order to continue a similar use." (emphasis added)[13]

---

[12] As already noted, even the trial court's order in this case understood that "institutional office use had . . . been granted by the 1951 variance for a headquarters . . . ."

[13] As evidenced by an earlier quote included in this Opinion, the Board has acknowledged on appeal that "'philanthropic use' **appeared first** in the 2017 Staff Report to the Board analyzing the application for an Office use, and again on the applicant's final site plan . . . ." (emphasis added) Obviously this acknowledgment undercuts the notion that such use was itself previously specifically approved, certainly with respect to that terminology. Yet, as we understand it, the Board's position appears to be that, because the recipient of the 1951 variance was itself a nonprofit, this makes it appropriate to apply the "Philanthropic institution" terminology that now exists in the UDC as a framework for viewing the use that was approved in 1951 (a time when the UDC did not apply). Of course, the whole controversy here essentially surrounds whether or not something other than non-office or non-administrative use was ever approved in relation to the Friends Property, and there certainly appears to be an understanding that "philanthropic use"/use as a "Philanthropic institution" is something potentially broader than merely the use occasioned by an office headquarters. Yet, what in the record signifies that something more expansive than use outside of a "headquarters" was actually countenanced in 1951? No doubt, a nonprofit secured approval for the 1951 variance, but as we see it, the essential question relates to what use for that nonprofit was then approved. To quote again from the 2017 Staff Report: "[t]he language of the approvals lead one to the conclusion that the intended use of the property was for an institutional office use."

In closing, we hold in light of our foregoing discussion that the Board's decision to uphold the 2022 Zoning Letter does not withstand scrutiny. In reaching such a conclusion, it should be stressed that our Opinion obviously does not in any way foreclose zoning efforts that might be initiated with respect to the Friends Property in the future. Through this Opinion, we have endeavored to simply, and solely, address the action of the Board with respect to the 2022 Zoning Letter.

## CONCLUSION

In light of the foregoing, we reverse the trial court's decision to affirm the decision of the Board, and we remand the case to the trial court for the entry of an order reversing the decision of the Board.

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE